**In re Kye TROUT, Jr., Debtor.**

**Phillip D. ARMSTRONG, Trustee of the Estate of Kye Trout, Jr., Plaintiff,**

v.

**NORWEST BANK MINNESOTA, NATIONAL ASSOCIATION, Defendant.**

**Bankruptcy No. 87–05075.
Adv. No. 90–7010.**

United States Bankruptcy Court,
D. North Dakota.

Aug. 23, 1990.

See also 108 B.R. 235.

Phillip D. Armstrong, Minot, N.D., Trustee for plaintiff.

Christian Onsager, Denver, Colo., Lawrence Klemin, Bismarck, N.D., for defendant.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This adversary proceeding arises by Complaint of. the Chapter 7 Trustee challenging the extent and validity of Norwest Bank Minnesota, N.A. (Norwest) right to a lien in post-petition collateral arising by virtue of a stipulation for use of cash collateral. The Complaint, filed on January 31, 1990, and as amended on May 21, 1990, sets forth three separate theories only one of which remains at issue.[1] That centers upon a stipulation for use of cash collateral, the manner in which Norwest and the Debtor relied upon it, the manner in which Norwest later enforced its terms and whether that enforcement was circumscribed somehow by section 364 of the Code.

The case was tried on July 26, 1990, with the parties stipulating to the essential facts. From the evidence produced at trial, the stipulation of facts and the case file, the court makes the following findings of fact:

### Findings of Fact

The Debtor was an owner and developer of oil and gas properties with additional interests in ranching and Arabian horses. When he filed for relief under Chapter 11 on January 27, 1987, his largest secured creditor was Norwest with a principal outstanding of $5,056,243.60 and interest of $12,991.70. On August 15, 1989, the case was converted to a Chapter 7.

Pursuant to 1983 mortgages and security instruments Norwest held a pre-petition security interest in seventeen oil and gas properties situated in the states of North Dakota and Montana and held an interest in an additional number of oil and gas properties situated in the states of Nebraska and Wyoming together with the production and equipment associated with these properties.

On April 1, 1987, the parties entered into an interim stipulation for use of cash collateral. It was agreed that to and including August 7, 1987, all oil and gas production proceeds would be deposited in a cash collateral account at the bank from which the Debtor would be entitled to use up to $60,000.00 per month for operational expenses. To the extent the cash collateral was used, the bank was entitled to a post-petition lien in oil and gas production produced post-pe-

---

1. That portion of the Trustee's second cause of action seeking equitable relief for breach was dismissed by Order entered June 1, 1990. The remaining allegations of the second cause of action and the third cause of action were conceded by the Trustee at trial to be emasculated by the stipulation of facts (discussed herein) and otherwise not viable.

tition. The stipulation was first approved on an expedited ex parte basis due to an emergency need to meet payroll, utilities and insurance. It was duly noticed and a hearing was held on May 6, 1987, resulting in an order for its approval. On August 18, 1987, the parties entered into a stipulation for the extension and minor amendment of the prior April stipulation by increasing the monthly draw to $63,000.00 and providing for termination upon thirty days written notice by the bank. This extension agreement was the subject of an ex parte motion for continued use of cash collateral filed by the Debtor on August 20, 1987. No notice of the motion was given and no hearing was held but the extension agreement was approved by an Ex Parte Order entered August 25, 1987, wherein it was specifically noted by the court that the amendment and extension did not affect the rights of any creditor not a party to it.

Norwest, concerned over a diversion of funds from the previously established collateral account was reluctant to allow further withdrawals by the Debtor pursuant to the extended stipulation agreement and withheld disbursements for the months of November and December 1987 and January 1988 pending an audit and further negotiations.

On February 1, 1988, the parties executed a new stipulation for the continued use of cash collateral under which the bank's lien in pre-petition collateral was continued plus it was given post-petition liens in sixteen additional oil properties. The sixteen wells given as post-petition collateral for the use of cash collateral are regarded by both Norwest and the Debtor as essentially worthless. At an earlier hearing the Debtor himself opined that all sixteen wells were worth a little less than $100,000.00 but at trial and by stipulation Norwest agreed to value them at zero and release its lien in all of the post-petition oil and gas properties. Under the terms of the Stipulation Norwest was also granted a security interest in the Debtor's interest in Rolling Hills Ranch partnership, a Califor-

nia partnership whose principal asset is ranch land. (Rolling Hills is itself in a Chapter 7 bankruptcy venued in the Bankruptcy Court for the Central District of California). The land has been sold and although the parties have not stipulated to any value, according to Norwest's best estimates the value of the Debtor's partnership interest distribution may be as high as $1,520,000.00 excluding expenses of administration and other potential expenses estimated to be $370,000.00. Under the February agreement the Debtor was allowed a draw of $77,000.00 per month. The stipulation was filed as the object of a Motion for Use of Cash Collateral and Approval of Stipulation on April 12, 1990. It was noticed to all creditors of record and scheduled for hearing on May 9, 1988, for the United States Magistrate.[2] At the hearing the Magistrate stated the stipulation would be approved with several minor modifications. Debtor's counsel was instructed to prepare and submit an order for signature. The order was ultimately submitted and the Magistrate signed and entered it on July 11, 1988.

Due to procedural infirmities, by now well known but which are not an aspect of the issue at hand, the U.S. Bankruptcy Judge entered an Order on June 22, 1989, approving the February stipulation nunc pro tunc.

Between April 23, 1987, and February 8, 1988, the Debtor used cash collateral in the amount of $950,804.48. Included in this figure is the amount of $231,000.00 disbursed on February 8, 1988, for past disbursements withheld for the months of November and December 1987 and January 1988 in the amount of $77,000.00 each.

Subsequent to February 8, 1988, and through July 6, 1988, an additional $392,-500.00 of cash collateral was consumed pursuant to the stipulation. As a consequence, Norwest by virtue of the February stipulation claims a lien in post-petition col-

---

2. The hearing was scheduled before the Magistrate because the district's only Bankruptcy Judge was awaiting reappointment pursuant to

28 U.S.C. § 152. Reappointment occurred on May 23, 1988.

lateral in the amount of $1,343,304.48 exclusive of interest.[3]

The value of Norwest's original pre-petition collateral is agreed to be $2,030,707.00, it being understood that several of the properties remain unvalued as of the present and will be valued as they are sold. Norwest has previously abandoned three pre-petition oil and gas properties (Carpenter A, Wyoming having a deemed value of $1,095,696.00 and two Feland wells in Bottineau, North Dakota having a deemed value of $340,449.00), crediting the Debtor's debt with their deemed value of $1,234,812.00 in the aggregate. The bank has agreed to credit the estate with the actual sale value of the Feland wells which would increase the credit by $201,324.00. When thus corrected, the credit should be $1,436,145.00 which leaves pre-petition collateral available with a value thus far determined of $594,562.00. The bank also previously credited the Debtor's account with $13,068.00 held in a tax escrow account and has also credited the account with the proceeds from pre-petition oil and gas wells and revenues of $33,000.00 from two post-petition wells (Evanston Townsite A and Mike's Draw Unit). After crediting the Debtor's account with the abandoned properties and the proceeds account, Norwest is still owed as of June 10, 1990, $3,691,196.00 principal, $660,674.69 interest and in excess of $150,000.00 in fees and expenses. The collateral available to satisfy the remaining indebtedness consists of the remaining pre-petition collateral worth only $594,562.00. The cash collateral as consumed is protected by interest in the post-petition oil properties which are agreed to have no value and the Rolling Hills partnership interest worth perhaps $1,150,000.00. The total value of the remaining pre-petition and post-petition property is less than the balance due on the bank's debt and the value of the post-petition collateral granted as adequate protection for use of the cash collateral is less than the $1,343,301.48 cash collateral consumed.

There is no dispute that the Debtor, Kye Trout, Jr., was definitely in default under the February cash collateral stipulation.

## Conclusions of Law

The Trustee charges that the stipulations for use of cash collateral and for adequate protection in the form of replacement liens are ineffective until approved by court order and that as a consequence, any cash collateral sums released by Norwest in advance of court approval are not secured by the purported replacement liens but rather, are relegated to the status of unsecured claims. Further fault is found with the fact that the later amendment and extension agreement of August 1987 was approved by an ex parte order without notice or hearing. This, says the Trustee, completely voids any post-petition lien purportedly extended by the August stipulation. He asserts that the stipulations cannot be retroactively approved by later court order and thus, the post-petition lien in the Rolling Hills Ranch partnership (the only post-petition property with any value) is invalid because no court order was entered until July 11, 1988, some months subsequent to the actual stipulation date.

The Trustee characterizes the stipulations as "post-petition financing stipulations" and, relying upon section 364(c) of the Code asserts that a post-petition financing arrangement can never be effective until and unless there has been notice, an opportunity for hearing and court approval.

Section 364(c) is a method by which a debtor, unable to obtain unsecured credit necessary to the ongoing needs of its business, may obtain new money from a lender by providing that lender with security. The concept of new money is fundamentally different from a wish to use cash collateral. In the latter situation a debtor is not obtaining new money from new sources but is merely seeking authority to consume collateral already existing, normally in the form of cash proceeds, and already pledged as security to an existing creditor. Under

3. Norwest in its second Motion for Summary Judgment filed July 3, 1990, calculated interest on the cash collateral to be $274,588.00 and calculated costs and expenses to be $46,600.00 for a total due pursuant to the terms of paragraph 3 of the stipulation, of $1,613,688.00.

section 364(c) the court, after notice and hearing may authorize the obtaining of secured credit. Under section 363(c)(2), however, a debtor may use cash collateral in the ordinary course of business without notice or hearing or court order in certain instances. Section 363(c) provides as follows:

(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203, or 1204 of this title and *unless the court orders otherwise,* the trustee *may* enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, *without notice or a hearing,* and may use property of the estate in the ordinary course of business *without notice or a hearing.*

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section. (emphasis added).

■ Sections 363 and 364 are similar in that both require notice and hearing as well as court approval but where they are distinguished is that a use of cash collateral is authorized without notice and hearing if the entity having an interest *in such cash collateral* consents. The absence of a notice and hearing requirement applies both in the case of secured creditors having interest in the property as well as creditors generally. Upon request of a party having an interest in the property being used, the court, with or without a hearing may condition the use as is necessary to provide adequate protection. 11 U.S.C. § 363(e). But here the court becomes involved only if an entity having an interest in the property itself requests that the use be conditioned upon sufficient adequate protection. A use of cash collateral proposed under section 363 contemplates within the very language of the statute itself that the debtor and affected creditor may stipulate to cash collateral usage and may also agree upon a form of adequate protection without any need for notice, hearing or court approval. If a debtor moves for use of cash collateral and has no agreement with an affected creditor, then the motion must be noticed but even then it is only when a creditor having an interest objects that the court must become involved in determining whether that interest is adequately protected. Notice, hearing and court approval are not prerequisites to a stipulated use of cash collateral in the ordinary course of business and since it is not for the court, in the first instance, to fashion adequate protection, the parties themselves may provide for it by stipulation. Ex parte agreements of this kind are not invalid. *See, e.g., In re Blehm Land & Cattle Co.,* 859 F.2d 137 (10th Cir.1988).

■ The history of the Debtor's use of cash collateral belonging to Norwest satisfies the requirements of section 363. In the beginning and throughout the course of the stipulations at issue the Debtor-in-possession was using all property production revenues in the ordinary course of his business. These revenues constituted cash collateral belonging to Norwest who agreed to the use consistent with the terms of the stipulations which conditioned the use upon providing adequate protection in the form of liens on post-petition property. The parties' relative interests and responsibilities are fully set forth in the stipulations and it is doubtful whether under section 363 that any notice or hearing was even required. Nevertheless, the April 1, 1987 Stipulation did come on for hearing upon notice and was approved by court order. This particular agreement was extended by stipulation and order and both were subsumed into the February 1, 1988 Stipulation. That stipulation was duly noticed to all creditors by virtue of an April 12, 1988 Motion, came on for hearing in May, was approved in open court on May 9, 1988, and formally approved by Order entered July 11, 1988. The Motion filed on April 12th professed a continuing need for cash collateral for the Debtor's ongoing business and alleged that no other source of funding existed. By July 11, 1988, the Debtor, acting in reliance upon the stipulations had used all of the

cash collateral it ever was going to—a total of $1,343,304.48. Norwest, also relying upon the stipulation, believed the consumption of its cash collateral was adequately protected by the advance of additional post-petition security.

This court has previously declined to re-write or invalidate stipulations for adequate protection where both parties were thoroughly represented. *In re Mutschler,* 45 B.R. 494 (Bankr.D.N.D.1984). It has consistently been of the opinion that debtors and secured creditors must remain free to negotiate between themselves for the use of cash collateral and adequate protection for that use. The Code presumes such agreements are valid without the need for notice, hearing or court approval. *See generally,* 2 *Colliers on Bankruptcy* ¶ 363.04 15th ed. 1989. In ensuing jurisdictional confusion wrought by the reappointment process, this court, in approving the February 1, 1988 Stipulation nunc pro tunc, noted in its Order of June 22, 1989, that the parties thereto operated under a presumption of validity and the court further held that the February Stipulation was a valid contract capable of enforcement, infirmity of the Magistrate's jurisdiction notwithstanding. The court's opinion remains unchanged. Further discussion of the Trustee's arguments is not helpful since they assume the Stipulation is infirm by virtue of inadequate notice or tardy court orders, neither of which the court regards as critical under section 363.

Accordingly, and for the reasons stated above, the court finds that the Stipulation of February 1, 1988, and its predecessors are valid and binding upon the parties as provided for by the respective stipulation terms and Norwest bank is entitled thereby to a post-petition lien in the sum of $1,343,-304.48. Judgment of dismissal may be entered in favor of the defendant, Norwest Bank Minnesota, N.A., and against the plaintiff, Phillip D. Armstrong, Trustee of the Estate of Kye Trout, Jr.

SO ORDERED.